In re AMERICAN INSULATOR
COMPANY, Debtor.

AMERICAN INSULATOR
COMPANY, Plaintiff,

v.

MARSH PLASTICS, INC., Defendant,

v.

KRAFT AND KRAFT, P.C.,
Additional Defendant.

Bankruptcy No. 85–00675G.
Adv. No. 85–0629G.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 14, 1986.

Robert Szwajkos, Rubin, Quinn & Moss, Philadelphia, Pa., for debtor/plaintiff, American Insulator Co.

Kenneth F. Carobus, Morris & Adelman, P.C., Philadelphia, Pa., for defendant, Marsh Plastics, Inc.

Martin Kilstein, Kraft & Kraft, Philadelphia, Pa., for defendant, Kraft and Kraft.

## OPINION

EMIL F. GOLDHABER, Chief Judge:

In a preference action under 11 U.S.C. § 547(b) of the Bankruptcy Code ("the Code"), the primary question for decision in the instant case in proving the debtor's insolvency is whether the debtor's assets should be attributed the value accorded them in the debtor's balance sheet or rather the value reflected in recent appraisals of the assets. For the reasons stated herein, we conclude that under § 547(b)(3) insolvency is better gauged by the appraisal value of the debtor's assets rather than by the debtor's self-serving balance sheet value of those assets.

The facts of this case, drawn largely from the parties' stipulation, are as follows:[1] In 1985 the debtor filed a petition

for reorganization under chapter 11 of the Code. Prior to the filing, goods were delivered to the debtor by Marsh Plastics, Inc. ("Marsh") in June of 1984. The debtor failed to pay for the merchandise, thus prompting Marsh to obtain judgment several months later. Within 90 days prior to the filing of the petition the debtor transferred $11,661.00 to Marsh in partial satisfaction of the indebtedness which arose from Marsh's above mentioned sale of goods to the debtor.

The law firm of Kraft and Kraft, P.C. ("Kraft") acted as a collection agent for Marsh and retained $2,325.81 from the funds which were paid by the debtor to Marsh. The parties are in agreement that if the transfers by the debtor to Marsh are found to be preferential, Kraft is liable to the debtor for the sum it retained.

The *schedules* filed with the debtor's reorganization petition state that as of the filing of the petition the debtor's assets totalled $8,353,368.00, while its debts were only $4,056,903.20. The debtor's *balance sheets* reflect that its assets, as of the filing of the petition, were $2,862,283.57, while its debts were $4,314,114.57. During the 90 day period preceding the filing of the petition, the debtor's balance sheet was substantially unchanged for purposes of this action. We expressly find that the debtor's assets were worth less than $2,800,000.00 at the time of the filing of the petition and during the 90 day period preceding the filing. Marsh received greater value through the receipt of the preference than it would have received through distributions of the bankruptcy estate if the case were a chapter 7 proceeding and if the alleged preference had not been made.

Under common law a debtor could generally, through payment, prefer one creditor over another as long as the object of the transaction was to pay on a debt. 4 *Collier on Bankruptcy* ¶ 547.01, p. 547–8 (15th ed. 1985) (citing cases). Under various statutes, such as the Code, the common

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052.

law rule has been changed. Under scrutiny in this case is 11 U.S.C. § 547(b)(1) through (b)(5)[2] of the Code. The parties are in agreement that the elements of § 547(b)(1), (b)(2) and (b)(4) have been met. The predominant questions are whether the debtor has proved § 547(b)(3) (on insolvency) and § 547(b)(5) (on the receipt of greater value through the preference than would otherwise be received through distributions in bankruptcy).

Under § 547(b)(3) the debtor must prove that the alleged preference was "made while the debtor was insolvent." In establishing this element a debtor is typically aided by § 547(f) which states that "the debtor is presumed insolvent on and during the 90 days immediately preceding the date of the filing of the petition." The legislative history of § 547(f) refers to Fed.R. Evid. 301 for the operative effect of the presumption. S.Rep. No. 95–989, 95th Cong., 2d Sess. 89 (1978), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 5875. Rule 301 states as follows:

> Rule 301. Presumptions in General in Civil Actions and Proceedings
>
> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Fed.R.Evid. 301.

The parties are in dispute on the meaning of the presumption of insolvency.

Marsh subscribed to the "bursting bubble" theory of presumptions which states that the parties opposing the conception need only introduce a scintilla of credible proof to negate the supposition. The debtor contends that this theory accords too little weight to the assumption and argues that the presumption, in effect, has substantive evidentiary weight which is only rebutted on the admission of a quantum of credible evidence having at least the same weight as the presumption. While the majority of courts construing Rule 301 adhere to the "bursting bubble" theory, this adherence is largely sophistical with most courts giving some weight to a presumption even in the face of contradictory evidence. On the proper interpretation of Rule 301 the United States Court of Appeals and the commentators are split. *United States v. Jessup,* 757 F.2d 378 (1st Cir.1985); *Bratton v. Yoder,* 758 F.2d 1114 (6th Cir.1985); *McCormick on Evidence* § 345 (2d ed. 1972). We do not resolve the controversy here, since we find that under either theory the debtor has proved its insolvency at the time of the pertinent transfers.

On the issue of the means by which insolvency may be proved, the parties are also in dispute. The debtor asserts that the balance sheet test is sufficient while Marsh contends that the debtor's insolvency should be judged by the net worth established in the schedules of assets and liabilities submitted by the debtor with its petition.

Insolvency is typically defined in the alternative as the excess of liabilities over assets or as the inability of a debtor to pay

---

**2.**     (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

his debts as they become due. The first alternative is commonly known as the "balance sheet test" and this standard was adopted by the drafters of the Code for purposes of § 547(b). 11 U.S.C. 101(29); H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 312 (1977), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 6269. Simply because the test is commonly called the balance sheet test does not mean that a review of the balance sheet is the most accurate way to determine if the debtor was insolvent. The name is simply used to distinguish the balance sheet test from the other test which looks at a debtor's ability to pay his debts as they come due.

■ The difficulty with gauging a debtor's solvency by looking solely to the balance sheet is that assets are valued on the sheets according to the historical cost of the item subject to certain deductions, such as depreciation, and augmentations, such as capital improvements. This problem is illustrated by an estate consisting solely of a parcel of unimproved realty which was purchased in 1920. The value of the property is listed as the purchase price of the property in 1920. The balance sheet would not reflect any appreciation in the property which occurred over the last six and one-half decades. If the debtor's present liabilities are in excess of the 1920 purchase price of the realty but less than the current fair market value of the property, the debtor would be insolvent solely by reference to the balance sheets but would not be insolvent if the value of the property was determined according to recent appraisals. We therefore conclude that current appraisals of the debtor's assets afford a more accurate determination of the debtor's solvency than can be had solely by reference to the balance sheet. This view is supported by the Code's definition of insolvency which states, in part, as follows:

§ 101. Definitions

In this title—

\* \* \* \* \* \*

(29) "insolvent" means—

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation,* exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title; and

\* \* \* \* \* \*

11 U.S.C. § 101(29) (emphasis added).

■ Applying these conclusions to the case before us requires some analysis. Although the figures listed in the debtor's schedules are largely derived from fairly recent appraisals, we cannot adopt these figures since we find them less than completely credible. The business was purchased approximately four years ago, and as with many new businesses, operating capital was elusive. To succeed, the debtor needed bank financing, and its zeal toward that end is reflected in what may be termed "overly optimistic" appraisals of its equipment and other assets. Although armed with hindsight, we still have no mathematically certain method of sundering the optimism from the appraisals to derive an accurate value. While it no doubt leaves those questing for ideal justice somewhat unrequited, those of us vested with a judicial commission must often do the best we can with the tools available. Although we can offer no specific figure, after reviewing the evidence we are left with the clear and distinct impression that the value of the debtor's assets was less than $2,800,000.00 when the transfers in question were made. While this is a nebulous finding, it is nonetheless a finding of fact and, as such, is subject to reversal on appeal only if clearly erroneous. Bankruptcy Rule 8013; *Frank v. Arnold* (In re Morrissey), 717 F.2d 100 (3d Cir.1983).

■ We now move to the issue of whether the debtor has met the requirements of § 547(b)(5). As stated above, this provision states that the transferee must receive greater value through the alleged prefer-

ence than such entity would have received in a chapter 7 case through distributions of the bankruptcy estate had the transfer not been made. When the debtor is insolvent and the creditor is not fully secured, the recipient of a post-petition transfer generally will receive more through the alleged preference than he would receive through distributions in a chapter 7 proceeding had the transfer not been made. In the case at bench, the facts support the general rule, and thus the requirements of § 547(b)(5) have been met. Hence, the debtor has established a prima facie case for avoiding a preferential transfer.

Marsh defends the action by positing that § 547(c)(1) or (c)(2) insulate the transfers from avoidance. In pertinent part, § 547(c) states as follows:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

\*     \*     \*     \*     \*     \*

11 U.S.C. § 547(c) (in part).

Under § 547(c)(1) Marsh makes an amorphous argument that "new value" was given through the refinancing afforded by the debtor's bank. We find Marsh's position unfathomable. This fosters the dichotomy that *either* the proponent's advocacy in bankruptcy law exceeds our grasp of the subject matter *or* counsel's argument has degenerated from turbidity into mysticism. We favor the latter alternative and conclude that the defense is meritless.

■ Marsh has also broached the defense of § 547(c)(2) by asserting that the alleged transfers were made in the ordinary course of business or financial affairs of the debtor. The payments were made more than 16 months after the debt was incurred and only after Marsh had obtained judgment on the claim. Section 547(c)(3) provides that a transfer is "immunized" by § 547(c)(2) from the preference provisions of § 547(b) only if it was "made according to ordinary business terms." While consentual payments by debtors on judgments are hardly a rare phenonomen, Congress surely did not intend to define "ordinary business terms" in the preference provision as including the payments at issue in this case. This defense is likewise meritless.

We will enter judgment in favor of the debtor and against Marsh in the amount of $11,661.00. Judgment will also be entered against Kraft and in favor of the debtor in the amount of $2,325.81. Payments by Kraft will, of course, satisfy the debtor's claim against Marsh, dollar for dollar.